Good morning. Good morning, your honors. Maria Severson for the plaintiff and appellant Michael Aguirre. Can your honors hear me okay? Yes. Okay, thank you. I appreciate your confirming that. The record sought under the Freedom of Information Act in this case pertained to ongoing safety violations at the Santa Nuclear nuclear site during unloading and or downloading of 3.6 million pounds of nuclear waste into storage canisters and then embedding them on the beach. The NRC, the Nuclear Regulatory Commission, is the agency charged with protecting the public relating to the storing of for context into the records of what specifically was asked, a little backgrounds needed. When the Nuclear Regulatory Commission and its inspectors were put on safety, serious safety violations at the site, during the training process, the utility was using unapproved canisters smaller than that the actual ones. And there are records showing they frequently experienced bottoms being caught on a ring. These are like silos where the the nuclear waste is stored in like a cylinder and then that's put into a similar tube shape and it has rings and other devices to keep it sturdy or designed to keep it sturdy. So when it was going in there was there's records that they were frequently getting caught and they wouldn't seamlessly go in. These silos have 100,000 pounds of stored nuclear waste. You're burning up a lot of time on facts. We're well acquainted with the factual background here and you've got three cases to cover. So can we get to the merits of one of the three cases? We can. I agree. We know those facts. Maybe you can start with, I have a question with respect to request 154 and 155. At what point did the NRC issue a complaint determination within the meaning of FOIA? The NRC, so I can understand your question, when did the NRC respond to the complaint determination within the 155? Sure. Well in 154 and 155, first they were late responding. Then when they did respond, they described, they said that they want, they described the plaintiff as a commercial requester when in fact that was not true. They then, and that was on January 30th, was their late response. On February 5th, they described the requester as a commercial use, which is not true, and even the judge said I don't think that's, is not appropriate because you can't request fees because the NRC was late. Mr. Aguirre then filed an appeal and a request to expedite and sought assurances that the NRC would respond within 10 days. The NRC asked for two things. One, the writings prepared from the NRC team interview of the licensee and contractor staff involved or present during the August 3, 2018 misalignment incident. That is very specific and precise. The record, the request also asked for records relating dry cast storage operations. So the NRC then said, you have to, why didn't you respond to the email request for clarification? It didn't seem to me to be an onerous request on the part of the agency. I understand, but what the NRC didn't do was ask for any clarification as to the first request within 154, and that's really the meeting. Counsel, my question is why didn't you respond to the email from the agency asking you to clarify the scope of the cask operations records that you saw? Your Honor, we had done by then a request to expedite, and the, when a request for expedite is done, the, the agency must make a determination within 30 days, and they jumped the gun. They were late to respond. You are talking right past, I got to, as a, you're talking right past Judge Tallman. He's asked you the same question several times in a row. I'm going to ask you one more, one more time. Why did you not respond to the email? Because we didn't run out of time yet to respond. They filed, they closed the case prematurely before we even had time to respond. But the dates are important. How difficult would it have been to simply say, we want all the training records, everything that relates to cask storage versus everything relating to the August incident? I mean, that, it was a very simple question, and I don't understand why you remained silent in response to the agency's reasonable request for clarification. Your Honor, I hear your comments, and please allow me to respond. There are, what's really important is they only asked for clarification as to one aspect of the, of the request. There was two requests embedded within 154. Two very distinct requests. One is what I read regarding the team interviews, the interview of it. Then it said, also, please provide the NRC records related to dry cask storage operations. Why didn't the NRC respond? I don't, answer the question, why didn't you respond? Is it because I didn't want to? I didn't have to? Why didn't you respond? We didn't respond because we just didn't respond, Your Honor, okay? And the, but the point is, too, there was time where we could have responded, but it was closed prematurely. So there was still time to respond, and the NRC closed the case prematurely. But the NRC... I just don't understand why a simple response would have been, we want all the records, or no, we only want the cask operations records pertaining to the August incident. Your Honor, let me go... We didn't have time to respond. And I appreciate that. We didn't respond, and those are the facts. But, Your Honor, that is one request. What about the other requests? Neither the court below... Well, that's what, we want to deal with, we want to deal with each of them, and, and we've just spent several minutes going around of what, and if you just said in the first thing, we didn't want, we didn't respond, and we don't want to give a reason why, we just didn't. Then, okay, but let's, let's talk about, uh, uh, how do you respond to the NRC's argument that Aguirre was required to exhaust his administrative remedies once the NRC responded to his request, even if it responded late? Why shouldn't we apply the rule that the D.C. Circuit has adopted in Ogilvie v. U.S., United States Department of the Army? Your Honor, these are, this was a delayed tactic. The, we did it, the, we had had a very specific request that the NRC just, none of the, no, there was nothing in the record before this court that the NRC ever addressed the specific request relating to Ogilvie. Right, they did, they were late on some things, and, but it was before you filed suit, and Ogilvie, which is a D.C. Circuit case, and all other circuits that have spoken on this, have joined in applying Ogilvie, that basically says if they, if they respond before you file suit, then that, that, that, um, that works, and then you have to exhaust. So, why shouldn't we apply Ogilvie? Your Honor, you can apply Ogilvie, and it's still fine for the plaintiff in this case. The dates are such that an appeal, the, the plaintiff once said, we, I will pay up to $1,500. That's pursuant to the code, it got in front of that and said initially I would pay $1,500. Then when they say, well, will you pay $563? We had already said we'll pay $1,500. Then there was a clarification request, as you pointed out, on one aspect of it. We didn't respond to that, but there was still outstanding the request for the records relating to the writings and the interviews as to the August 3rd incident. We interpreted it as a delay tactic. While it was still pending, we're, we're waiting for a response. The letter said, please give assurances that the undersea is going to work with us in getting the records. What did the undersea... Did you ever pay the $250 that they asked you to pay up front? We couldn't. By the time they closed the request prematurely. They had to keep the expedite request open for 30 days. Think about this, Your Honor. On the one hand, you have the request for, they're late on the request, and then they're early on the closure. And yet it's the plaintiff that didn't exhaust the administrative remedies. The court even questioned that they were even able to charge fees. That's right in the lower judge's ruling, questioning because... I'm going to ask you to move to 239 and 304. Did Gary ever administratively appeal the agency's responses to requests 239 and 304? It was deemed futile at that point. The answer would be you did not. Is that correct? That's correct. And that is required as part of exhaustion. But your response to that, if I'm parsing it out, is you're saying it was futile. Yes. You should be deemed exhausted, even though you did not administratively appeal. Am I correct on that? That is correct. You're at three and a half minutes right now if you want to reserve, unless either of my colleagues have questions. Yes. Thank you. I would like to reserve. I see the clock shows. Okay. Thank you. All right. We'll hear from the government at this point. Thank you, Your Honors. Over the course of six months... Why don't you state your name and your appearance for the record for us. My apologies. I'm Rebecca Church. On behalf of the United States Nuclear Regulatory Commission. Over the course of six months, Michael Aguirre submitted 14 separate but overlapping FOIA requests relating to the loading of spent nuclear fuel casts... Excuse me. Can you stop the clock just for one second? I think we lost Ms. Severson's picture. Can we have... Okay. Thank you. Thank you. We like to have both people. Just in case you're making faces at each other, we want to see your faces. Okay. All right. Let's go back on the clock then. Go ahead. Thank you, Your Honor. Although he submitted 14 separate but overlapping FOIA requests, he initiated three lawsuits on just four of the 14 requests. And the NRC has produced voluminous records in this case, including over 700 pages of documents, of video, and making proactive disclosures on its website. With regards to the particular cases... Yeah. Well, it looks like... At what point did NRC issue its request determination as to requests 154 and 155? And did you ever notify Aguirre of his right to appeal any aspect of the agency's response? So the acknowledgment was issued on January 30, 2019, as to both of those FOIA requests. Was that late? Were you late in the determination on those? Yes. Five days late. So 20 working days plus five days. So, yes, that was a late response. But as the court noted, it was the response before the suit was initiated, and the agency began working on the request right away. And there are two separate requests there. 154 is the one in which the agency sought clarification. And I just want to clear up a factual thing in the record, that in the request for clarification, it does refer to needing that information also for determining the fee issue in that case. And I'll note that the fee estimate that was issued by NRC on February 5, 2019, was for the other FOIA request, for 155. So there had not been a previous fee estimate issued in 154. Okay, it seems fairly clear. Your request for clarification, you know, I mean, what if you look at it, it seemed pretty clear what they were asking for. So if you want to keep requesting clarification, that seems like it's a perfect way for bureaucrats and the government to keep dragging their feet. You're already late, and, you know, and I got you. The language is pretty clear what the time is there. Why did you really need clarification? Well, from the agency's perspective, the word operations really could have been used in two different senses. There was part of the request that was targeted, and then also could we have other documents related to operations. Well, does that mean operations regarding that specific incident that you're talking about, or operations, this is the nuclear facility, operations of the facility. But any response, you know, would have helped the agency to determine. And given you more time, too, and given you more time. Well, in this instance, the agency was already processing the request, so it needed the information. I don't know exactly how it would have impacted time, apart from allowing the agency to respond to the request more accurately and efficiently. Well, okay, so the Ninth Circuit hasn't really spoken to Ogilvie, and it was decided a long time ago. And I think that there's a pretty decent argument that the plain language of the statute doesn't really comport with Ogilvie. So why should we adopt Ogilvie so to give, you know, governments a longer time to drag their feet? In plain language, it seems like what Congress was trying to do was say, hey, when you get these, take them seriously, get them done. And the textual argument here seems better suited for the fact that why we shouldn't go with Ogilvie. And the current Supreme Court, maybe they would revisit it. I don't know. Well, I think Ogilvie did strike the right balance between encouraging agencies to respond and allowing all parties.  It makes a lot of sense. And if I look at parties and if I would say, okay, Ms. Severson said they didn't respond because they just didn't respond. And then you're saying you're late because we're late and all of that. And so it's great to say, why don't the parties work together so that you don't bother all of us with your petty disagreements before you get to federal court, okay? That makes sense. But if I look at the language of the statute, the statute seems to be wanting to hold the government's feet to the fire. It doesn't seem to be wanting to strike the right balance to make everyone's life better and to make everyone get along and sing kumbaya. I think that it does acknowledge, in a sense, the benefit of the administrative process. There's a lot in the FOIA itself about the administrative process. And those are important to efficiency, to the parties. A lot of these are very minor issues that if there's appropriate back and forth between the requester and the agency, that it can be resolved. And the FOIA encourages that back and forth. There's a lot of... Would you agree that the plain language of the statute seems to say that you have to... that puts those time constraints out there? So where in the statute, where are you drawing from the fact that they want to give the government more flexibility? Where are you seeing that in the statute? I'm not seeing it in the plain language. Do you see it in the plain language? I think it would have to be inferred from the other portions of the statute setting up the administrative process and including an administrative process for even other instances such as request expedite. That if it were not a priority in the FOIA and an encouragement in the FOIA for the parties to work together like this, that those would not be included and essential in the FOIA itself. The district court seems to note that FOIA appears to bar TARDI agencies from assessing fees. The agency responded late to requests 154 and 155. So how could you use that basis for your refusal to process 155 on a jury's failure to pay? So the bar would be as to the search portion of the fees. There are search and review fees included in FOIA requests. So just the review portion of it still is over $250 in this case. And, again, that's an issue. If the requester had a problem with the fee estimate or raised that issue with the fee estimate, likely that's something that could have been worked out with the agency in the administrative process. It's not a jump the line, go straight to court issue. So you would say that you can refuse to process 155 on his failure to pay? Does the law allow you to do that? Yes, Your Honor. Even though you were TARDI in the first place? Yes, Your Honor. And I'll just note that there wasn't a response to the request for fee estimate. There was the only response that came on February 8th was related to the timing of the request. It did not reaffirm a commitment to pay. It did not respond to the commercial. It did not challenge the assessment of search fees. It didn't cover any of the fee estimate that had been submitted. And there was a date certain given in there of when the date the payment would need to be received to process the claim, and the case was administratively closed after that date. May I move on to any of the other requests, or would you like to continue to focus on this? I don't have questions right now, so you can continue with your presentation. Okay. So as to the other two FOIA requests, the case number two, the 239 request, the case went to the FOIA request was submitted on March 19th, 2019, and the case was filed in the district court just 10 days later on March 29th, 2019. And I'll just note that the complaint itself is a regular FOIA case requesting production of documents. It's not narrowly tailored to be a complaint-challenging expedited processing. So if you'll look at the complaint in the jurisdiction and in the claims and the request for relief, it's for production of records. So in that case, that's within even the response period, although it should be noted that the agency had already started processing and working on that complaint and ended up making a final production even after the complaint was filed. And then finally on 304, sorry, case number three, FOIA request 304, that's the case in which there was a final response and production by the agency on June 11th, 2019, and the complaint was filed just one day later with no appeal to the agency in the interim. And I'll just note that the court, initially the complaint only included a claim FOIA request ending 304. It didn't include any allegations about exhaustion, so the court dismissed it with leave to amend to the extent that the requester could show exhaustion, could allege exhaustion. When the first amended complaint was filed, it added those three other FOIA requests that were not in the original complaint, 309, 310, 311. The district court dismissed it with prejudice for failure to exhaust, but also on a separate and distinct ground that was failure to comply with the court's order. So the court had granted leave as to a certain type of amendment, and the amended complaint did not fit with that. Let me ask you this. You've got 154, 155, 239, and 304, right? Those are the four things that are before us. Yes, Your Honor. For you to prevail, which one of those require us to apply the reasoning of Ogilvie? Only 154 and 155 included a late response at all. It was over the 20-day response period. I'll note that it was five days over. The agency didn't invoke the other 10-day extra extension for exceptional services, so that's why it ended up being late as compared to within the timeline. So the other two cases are just failure to exhaust cases. On 154 and 155, hypothetically, if I don't agree with the reasoning about Ogilvie and I don't want to accept that in the Ninth Circuit, is there any way you prevail? Yes, Your Honor. I think the portion of Ogilvie that we're focusing, if I'm not inferring too much or that I hear you focusing on here, is that it's a requirement that the appeal must be filed if there's a response, even if the response is late. Ogilvie also covers, and the Ninth Circuit has explained, the prudential concerns of exhaustion. Even when exhaustion is not considered to be completely required, you consider the prudential considerations of it in context. And I would say the facts of this case, showing how the agency was a very short amount of time, late five days, they were working on the request, they were doing things to facilitate processing efficiently of the complaint of the request, seeking clarification, processing the fees, receiving no response of narrow and reasonable questions. All of that fits within the prudential considerations of why exhaustion still should occur and would still have benefited this case and the Court from hearing these issues, which are common FOIA issues that can be resolved at the agency level. They do not need to go straight to Court. Thank you. That's all I have. Thank you for your time. All right. Thank you. All right. We'll go back to you, Ms. Severson. And you have four minutes and 24 seconds on the clock. Thank you, Your Honor. Ms. Severson, could you focus on 154 and 155? Yes. Have all of the documents in response to those two requests been provided? No, they have not. As between 154 and 155, which one have your client not received all the documents? As to 154, we have not received documents that pertain to the interview records between the licensee and the NRC and staff regarding the August 3rd incident. And conspicuously, Your Honor, that is what the NRC counsel didn't mention. This has been a bait and switch, a diversion, focusing on the clarification of what is the second item within request number 154. That has never been addressed, ever. There was never a request for clarification because it was precisely clear. Have all of the documents in response to 155 been produced? No, they have not. They have not. When talking about timing, the NRC closed. Ms. Severson, I believe that Judge Christensen asked you to identify the documents you have not received. And on 155, you said you haven't received all the documents. What are the documents on 155 that you have not received? Well, correct. We have not received documents that relate to the writing showing that the utility reported the discovery of the shimpan.  for more than a year observing. We asked, where are those communications? Where are their notes? Where are their reports as this shim regarding the broken shimpans? They used unapproved shim design canisters. Where are those records? We haven't received any of those. And it would be likely those exist. Ms. Severson, Ms. Church indicated that you have received, I think she said 700 pages of documents, I'm sure. Did you receive some documents in response to 154 and 155? We received documents that were generic and not specifically responsive. We didn't receive documents regarding the negative training. We didn't read documents regarding the shims. We didn't read documents regarding the communications between the utility regarding August 3rd and August 9th when they shut the plant, when they stopped the downloading. So I guess my question was, did you receive some of the documents? You're explaining to me what you didn't receive. We've talked about that. Did you receive some documents in response to 154 and 155? Your Honor, what we were given was what I'll call a guided tour. There was a referral to the NRC's website and basically go find it yourself. Those 700 pages of documents were things that were in the public domain. It was not the requested records. To respond to the issue about Oglesby, Oglesby was decided before Yagman. With regards to the request 239 on the expediting, FOIA does not require any exhaustion of administrative remedies. The statute allows you to go straight to a judicial remedy. With regards to the classification of requiring paying fees, one, the judge said you can't ask for fees because they're late. Two, the classification was contrived because it was not true, and the NRC later admitted it. The requester was not commercial, and the NRC even created some new hoops saying, submit articles of what you published to show your disseminated information. All things not in the code. Did you respond to the agency with regard to the characterization as a commercial request? Yes, we most certainly did. And we even rejected and still gave the agency. When did you provide that response to the agency? That was responded to the agency with a request to their commercial. It was actually on one of the, it wasn't in the 154, 155, because they prematurely closed the request. So that did not yet happen. So there was no response in that case? In that case. Okay. There was later. You know, Your Honor, at that point when they originally said pay it, the requester up front said I'll pay up to $1,500. To say that they came back and said, oh, you have to pay several hundred dollars and you didn't acknowledge it is belied by the fact that the requester affirmatively and unequivocally said they would pay the money. But you never tendered a check for $564.30? Your Honor, much to the requester's surprise, they closed the request. What's interesting is. So the answer is no, because they closed the request before we could mail the check. Before, right. They closed it. It was a done deal by then. They had closed the request, cut us off. And they closed the request at the end of February. Was it around February 22nd or 25th? Yes, yes. Okay. So you couldn't do it in three weeks? Well, it's not that. February 5th. It's not that I couldn't do it, Your Honor. The request, when they said you have to. I just don't understand why you just sort of blew off the agency here. I mean, I understand you think that they're dragging their feet and they're engaging in bait and switch, but you didn't make a very good record of that with the agency. You just ignored their communication. Your Honor, I respectfully disagree because the record shows that, one, the requester affirmatively said they would pay. And according to the statute, the agency is required to. Between February 5th and February 22nd, you didn't say anything. Crickets. Dead silence. Well, Your Honor, we had. Didn't you have the record? Well, the record is it asks for a response. You know, on the one hand, the NRC is saying, oh, you're not clear with the word operations, and therefore we're denying it. But they sent a letter saying this is how much it would cost, and please provide a response. It did not say payment. It didn't say payment. Now, that might be, you know, I'm not trying to get into semantics, but if they had contacted us. There's a regulation that says if it's going to cost more than $250,000, you've got to pay the money up front. It says may or, if you say it, you will do it. It's an either or. And when the agency said please provide a response, they did not say payment. Your Honor, I assure you, had it used the word payment, it would have been given. Okay? It would have been. They didn't use the word. They said respond. We sent a letter in response. The letter was thoughtful. The letter said please give us assurances that we're working together. Okay? And then it was the NRC that cut it like a guillotine, just cut it off. Okay. I understand your position. All right. We've gone three and a half minutes over, so unless any of my colleagues have additional questions, that will conclude oral argument. Nothing further. Okay. Thank you both for your arguments. This matter will stand submitted. Thank you, Your Honors.
judges: Tallman, Callahan, Christensen